IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF PENNSYLVANIA

| TRUEFIT SOLUTIONS, INC., | ) | |
| --- | --- | --- |
| | ) | Civil Action No. 19-145 |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | Judge Cathy Bissoon |
| | ) | |
| BODIES DONE RIGHT, LLC, | ) | |
| | ) | |
| Defendant. | ) | |

## MEMORANDUM AND ORDER

### I. MEMORANDUM

On February 1, 2019, Plaintiff/Counterclaim-Defendant Truefit Solutions, Inc., ("Truefit") filed a Complaint (hereinafter "Complaint," Doc. 1) against Defendant/Counterclaim-Plaintiff Bodies Done Right, LLC (hereinafter, "BDR"). On April 12, 2019, BDR filed an Answer, Affirmative Defenses, Counterclaims and Jury Demand, (hereinafter, "Answer and Counterclaims," Doc. 13), raising counterclaims against Truefit. On May 3, 2019, Truefit filed a Motion to Dismiss some of those counterclaims, (hereinafter "Motion to Dismiss," Doc. 16), and BDR timely filed a Response in Opposition (hereinafter, "Response," Doc. 21). On June 6, 2019, Truefit filed a Reply in support its Motion to Dismiss, (hereinafter, "Reply," Doc. 24).

After consideration of all briefing and documents filed by the parties,[1] Truefit's Motion to Dismiss (Doc. 16) will be granted in part and denied in part.

### A. BACKGROUND

As the Court writes mainly for the parties, it assumes familiarity with the facts in this case. When disagreement exists, the Court, as it must at this juncture, accepts the well-pleaded

---

[1] In response to the Court's Order of May 30, 2019, Truefit also filed unredacted copies of all relevant contracts between the parties the following day. (Doc. 23.)

facts set out in BDR's counterclaims against Truefit. Fowler v. UPMC Shadyside, 578 F.3d 203, 210–11 (3d Cir. 2009) (A district court "must accept all of the [pleading's] well-pleaded facts as true, but may disregard any legal conclusions.").

### 1. The parties' business relationship

BDR was in the process of developing an interactive fitness application that "provided end users with wellness and physical therapy services." (Answer and Counterclaims at ¶ 81.) BDR had previously engaged a service provider to assist with this development, but that relationship was "incredibility negative, economically detrimental, and did not provide BDR with a viable nor usable product." (Id. at ¶ 82.)

While BDR was looking for a new service provider, it was contacted by a Truefit employee, on August 9, 2016, who indicated that Truefit is a "software product development firm with design, research, and engineering services." (Id. at ¶ 83; cf. Complaint at ¶ 9.) From that date forward until the end of 2016, Truefit and BDR engaged in information sharing and negotiation around services that Truefit would provide to BDR. (Answer and Counterclaims at ¶¶ 84–90.) In connection with determining whether to engage in a business relationship, BDR shared summaries about its product and patents, gave Truefit credentials to its then-existing website, shared the faulty code draft of BDR's previous service provider, and provided Truefit with other confidential information. (Id.) BDR claims that the information it shared put Truefit in a "position of trust and expertise upon which BDR relied," that Truefit "promised and guaranteed that Truefit could provide a unified platform that would handle both wellness and therapy services," and that Truefit wanted to be a " 'long-term technology partner as [BDR] continue[s] to grow and develop the product.'" (Id. at ¶¶ 88, 89, 91.) At the end of 2016, BDR purchased a prototype application from Truefit for around $200,000. (Id. at ¶ 90.)

The parties' business relationship continued in 2017, although BDR contends that it soured almost immediately after it signed two written documents drafted by Truefit.[2] (Id. at ¶ 90.) BDR alleges that after it signed those documents, Truefit immediately changed the scope of the work it had promised to perform. (Id. at ¶ 95.) Specifically, BDR claims that Truefit falsely stated that the key deliverable, a unified platform for therapy and wellness, was not possible. (Id.) BDR avers that this was not in response to any work or work-related issues Truefit came across in development of the application, but rather was part of a "trap" and "scheme" by Truefit to "justify extracting hundreds of thousands of dollars from BDR, which BDR would be forced to pay under duress." (Id. at ¶¶ 93–95.)

BDR avers that that Truefit's scheme worked: "BDR began to pay the fees that Truefit demanded" and negotiated with Truefit in order to get "Truefit back on track to the agreed-upon unified therapy and wellness program." (Id. at ¶ 98.) As the weeks went by, BDR claims that it had "no actual product or code to show for the hundreds of thousands of dollars spent on Truefit." (Id. at ¶ 99.) BDR alleges it does not even have access to the "prototype that BDR bought and purchased from Truefit at the inception of the relationship" because Truefit disabled BDR's access to the prototype. (Id. at ¶ 102.) BDR claims significant damages as a result of Truefit's conduct, including loss of confidence from investors and associates who splintered off from BDR. (Id. at ¶¶ 101 ,103.)

---

[2] The written documents related to the parties' business relationship, as have been provided to the Court, are discussed in Part A.2., *infra*.

## 2. Written documents related to the parties' business relationship[3]

In February of 2017, the parties agree that Truefit provided BDR with two written documents for signature: A Master Services Agreement (hereinafter, "MSA," Doc. 1-1) and a Proposal for "BDR 2.0 – Unified Therapy and Wellness Platform" (hereinafter, "Unified Proposal," Doc. 23). The Statement of Background on the first page of the MSA states that "Client wishes to engage Truefit to render services with respect to the Client's business, and Truefit is willing to render such services upon the terms and conditions set forth below."

The MSA sets out at Section 1.1 the following:

> Truefit agrees to provide to Client, under the terms and conditions hereof, the mutually agreed upon services on one or more proposed statements of work, in each case signed and dated by the Parties,[4] which shall become part of this Agreement (each a "Proposal").

(MSA at 1.) The term of MSA is defined at Section 2.1, and reads as follows: "This Agreement shall commence on the Effective Date." (Id.) The MSA provides terms for payment (Section 4) and a warranty (Section 7.1) which states, in part that "Truefit warrants that the Truefit Deliverables shall be performed or developed in a professional and workmanlike manner, and in accordance with standard industry practices." (Id. at 2, 4). A section entitled "Authorization" provides that: "The person(s) signing this Agreement on behalf of each Party hereby individually warrant that they have the full legal power to execute the Agreement on behalf of their respective Party and to bind and obligate such Party with respect to all provisions contained herein. (Id. at 6.) There is an integration clause at Section 9.7, which specifies that the MSA, along with any Proposals hereunder, are the entire agreement of the parties. (Id.)

---

[3] As BDR (and Truefit) relied on these written documents throughout their pleadings, (see, e.g., Answer and Counterclaims at ¶¶ 92, 94–96.), it is proper for the Court to rely on them at this stage. In re Burlington Coat Factory Sec. Litig., 114 F.3d 1410, 1426 (3d Cir. 1997).

[4] The MSA provides that "Client and Truefit shall sometimes be referred to individually herein as a 'Party' and collectively as the 'Parties.'" Doc. 1-1 at 1.

The first lines of the MSA, which contain blank spaces for the "Client" and the date, are incomplete, and there is no date anywhere on the MSA. (See generally id.) Despite a signature line being available for Truefit, the final page of the MSA provided to the Court is not signed by Truefit. (Id. at 7.)

The Unified Proposal has a cover page, which is dated February 7, 2017. (Unified Proposal at 1.) The Unified Proposal provides that "Payments are due according to the terms defined in our MSA." (Id. at 8.) On the final page of the Unified Proposal, under the word "Approval," is the following: "This proposal is covered by our Master Services Agreement, executed separately, which outlines the complete terms and conditions of our relationship." (Id. at 9.) The Unified Proposal is signed by BDR, but it is not signed by Truefit. Indeed, there is no line upon which Truefit is to sign. (Id.)

In August of 2017, Truefit drew up another proposal, "BDR 2.0 – Wellness 1 AMENDMENT to original Wellness Features from v1.1, February 9, 2017," to modify the scope of Truefit's work. (Complaint at ¶ 24; Doc. 23-1.) This agreement was never executed by either party. (Id.)

**B.     ANALYSIS**

"To survive a motion to dismiss, a complaint must contain sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible on its face.'" Ashcroft v. Iqbal, 556 U.S. 662, 678 (2009) (quoting Bell Atlantic Corp. v. Twombly, 550 U.S. 544, 570 (2007)). For purposes of this motion, the well-pleaded factual allegations contained in BDR's counterclaims are accepted. Fowler, 578 F.3d at 210–11.

1. **BDR's Counterclaims**

While BDR has brought several counterclaims, Truefit moved to dismiss three: fraud (Count I), breach of fiduciary duty (Count II), and breach of the implied covenant of good faith and fair dealing (Count III). Each will be addressed in turn.

a. Fraud

BDR alleges Truefit made false and misleading statements regarding the services that it would provide to BDR, and that, as Truefit intended, BDR relied on those false and misleading statements to its own detriment. (Answer and Counterclaims at ¶¶ 104–09.) BDR contends that the fraud "does not pertain to the performance of any contracts" but rather relates to Truefit "inducing BRD into signing contracts and making agreements with Truefit." (Id. at ¶ 109.)

In its Brief in Support of Motion to Dismiss Counts I-III of the Counterclaim (hereinafter, "Truefit's Brief," Doc. 19), Truefit argues that the MSA's integration clause and gist of the action doctrine bar BDR's fraud claim. (Truefit's Brief at 3–5.) Specifically, Truefit relies on the integration clause in the MSA and its understanding that because BDR's fraud claim is "indistinguishable" from its contract claims, it cannot proceed. In response, BDR argues that Truefit misunderstands its claim, which pertains to alleged misconduct by Truefit prior to BDR signing any documents. (Response in Opposition to Plaintiff/Counter-Defendant's Motion to Dismiss, hereinafter "BDR's Response," at 4, Doc. 21). Furthermore, BDR avers that the integration clause in the MSA cannot bar its claim, as Truefit did not sign the MSA. (Id. at 8.)

Pleading an action for fraud in the inducement requires evidence of the following elements:

> (1) a representation; (2) which is material to the transaction at hand; (3) made falsely, with knowledge of its falsity or recklessness as to whether it is true or false; (4) with the intent of misleading another into relying on it; (5) justifiable reliance on the

> misrepresentation; and (6) the resulting injury was proximately caused by the reliance.

EBC, Inc. v. Clark Bldg. Systems, Inc., 618 F.3d 253, 275–76 (3d Cir. 2010).

As the Court understands it, Truefit has not challenged the sufficiency of BDR's pleading as to these elements,[5] but instead has argued that BDR's claim is barred by either or both the parol evidence rule and the gist of the action doctrine. Both of these arguments are unavailing.

First, Truefit argues that the MSA—a contract that it did not execute—contains an integration clause that bars BDR's claim. As the MSA is on Truefit letterhead and appears to be a standard contract Truefit uses to engage clients, the Court concludes that Truefit drafted the MSA. When interpreting a contract under Pennsylvania law, courts must adhere to the following:

> In interpreting a contract, the ultimate goal is to ascertain and give effect to the intent of the parties as reasonably manifested by the language of their written agreement. When construing agreements involving clear and unambiguous terms, the Court need only examine the writing itself to give effect to the parties' understanding. The Court must construe the contract only as written and may not modify the plain meaning under the guise of interpretation.

Southwest Energy Production Co. v. Forest Resources, LLC, 83 A.3d 177, 187 (Pa. Super. Ct. 2013). Any contractual ambiguity is construed against the drafter, here, Truefit. McWreath v. Range Resources—Appalachia, LLC, 81 F. Supp. 3d 448, 460–61 (W.D. Pa. 2015).

---

[5] In the Court's judgment, BDR has sufficiently pleaded these elements. As an example, BDR has alleged that Truefit never intended to provide BDR with a unified therapy and wellness application—the primary deliverable for BDR—and that Truefit knew it never intended to provide BDR with that application from almost the inception of the business relationship. BDR has alleged that Truefit made that false representation to extract substantial amounts of money from BDR, and that BDR paid that money and did not receive any benefit. (Answer and Counterclaims at ¶¶ 101–09.) Thus, BDR has stated its fraud claim.

Where contractual text contemplates execution by both parties to bring about its provisions, and one party has not signed the contract, specific contractual terms cannot be invoked, even against the party who did sign the contract. Franklin Interiors v. Wall of Fame Mgmt. Co., Inc., 511 A.2d 761, 763 (Pa. 1986). In Franklin Interiors, the Supreme Court of Pennsylvania held that it was error to allow the plaintiff, who drafted an alleged contract and did not sign it, to enforce a confession of judgment provision against the Defendant, who did sign the alleged contract, where the contractual text required signature of the plaintiff to become a legally binding contract. 511 A.2d at 763 ("No assumption can be made that [Plaintiff] assented to the [confession of judgment provision] because it expressly conditioned acceptance of all the contractual terms upon its execution of the document. . . . Since the required execution by [Plaintiff] is missing, the confession of judgment clause cannot be invoked."); see also InfoComp, Inc. v. Electra Prods., Inc., 109 F.3d 902, 905–06 (3d Cir. 1997) (discussing Franklin Interiors and characterizing this principle embodied by its holding as "firmly embedded" in Pennsylvania law).

The analysis in Franklin Interiors controls the Court's conclusion on this point. The plain text of the MSA requires the signatures of both BDR and Truefit for its provisions to come into effect. Section 1.1 provides that "Truefit agrees to provide to the Client, under the terms and conditions hereof, the mutually agreed upon services described on one of more proposed statements of work, in each case signed and dated by the Parties." Section 9.6 requires the person signing on behalf of each party to warrant that they have "full legal power to execute the Agreement on behalf of their respective Party and to bind and obligate such Party with respect to all the provisions contained herein." Finally, above the lines for signatures for both parties on the final page, the following text is included: "IN WITNESS WHEREOF the parties hereto have

8

executed this Agreement as of the date first set forth above." As Truefit did not sign the document, it cannot invoke the integration clause to bar BDR's fraud claim.[6]

Second, the Court cannot say that the BDR's fraud claim is barred by the gist of the action doctrine. Truefit contends that BDR's claim at Count I is "indistinguishable" from its breach of contract claims and relates only to issues of contract performance, but, frankly, BDR has clearly expressed that that is not its claim at all. (BDR's Response at 8, 11–13.) BDR claims Truefit knew it could not provide a unified platform at the time it told BDR that it could, that Truefit used this misrepresentation to induce BDR to sign an agreement to pay Truefit money, and then that Truefit doubled down on this misrepresentation by trying to get BDR to pay even more money for a product it did not want. (Id. at 12-13.) Moreover, as the terms of the MSA deal primarily with the quality of the deliverables Truefitwould provide to BDR, Truefit's failure to sign the MSA supports BDR's contention with respect to this point: Truefit may not have signed the MSA because it never intended to provide anything the agreement contemplated to BDR.

Where an alleged fraud concerns the performance of contractual duties, such a claim is barred by the gist of the action doctrine. eToll, Inc. v. Elias/Savion Advertising, Inc., 811 A.2d 10, 19 (Pa. Super. Ct. 2002) (fraud claims which seek to vindicate contractually-imposed duties are not actionable in tort). If not, the gist of the action doctrine presents no barrier, and the fraud claim may proceed. Id.

---

[6] The Court notes that even if it were to find a valid contract as a matter of law, there is no effective date given for the MSA. In other words, even if the MSA imposed duties on the parties, there is no way to know when those duties took effect (or are to take effect) based a plain reading of the MSA's terms.

9

A review of eToll's guidance counsels in favor of allowing BDR's claim to proceed, as the fraud it alleges is a breach of broader social policy, collateral to the terms of any alleged contract. 811 A.2d at 14–17. The gist of the action doctrine does not apply to misrepresentations made to induce a party to a contract or to a use of pretextual contract to extract money from another party. Air Prods. & Chems. Inc. v. Eaton Metal Prods. Co., 256 F. Supp. 2d 329, 341, 343 (E.D. Pa. 2003) (Allowing fraud claim to proceed after reasoning "fraud in the inducement claims are much more likely to present cases in which a social policy against fraud, external to the contractual obligations of the parties, exists."); see also Howe v. LC Philly, LLC, 2011 WL 1465446, at *3–5 (E.D. Pa. Apr. 15, 2011) (denying motion to dimiss fraud in the inducement claim based on presentation of agreement to partner with defendant offered to "entice" the plaintiff into signing agreement when no such partnership was contemplated by defendant); J.J. DeLuca Co. v. Toll Naval Assocs., 56 A.3d 402, (Pa. Super. Ct. 2012) (fraud claim based on "bogus billings" and use of a "contract as a pretextual, or vehicle, to bill" may proceed).

Therefore, Truefit's Motion to Dismiss BDR's fraud claim will be denied.

  b. Breach of Fiduciary Duty

BDR states that "Truefit held a position of trust and expertise upon which BDR relied" and that while in the position it made false representations to mislead BDR for its own benefit and to BDR's detriment. (Answer and Counterclaims at ¶¶ 110–12.) In its Motion, Truefit argues that the parties were in a standard business relationship, and BDR has not pleaded sufficient allegations to convert that relationship into one in which Truefit owed a fiduciary

duty.[7] (Truefit's Brief at 6–8.) BDR stands by its pleading and directs the Court to where it believes it has pleaded each element sufficiently. (BDR's Response at 14–16).

In Pennsylvania, a plaintiff alleging a breach of fiduciary duty must plead the following elements:

> (1) the existence of a fiduciary relationship; (2) that the defendant negligently or intentionally failed to act in good faith and solely for the benefit of the plaintiff in all matters or which he or she was employed; (3) that the plaintiff suffered injury; and (4) that the agent's failure to act solely for the plaintiff's benefit . . . was a real factor in bringing about plaintiff's injuries.

Calhoun v. Invention Submission Corp., 2019 WL 1547372, at *10 (W.D. Pa. Apr. 9, 2019) (Bissoon, J.). "[T]he critical question is whether the relationship goes beyond mere reliance on superior skill, and into a relationship characterized by 'overmastering influence' on one side or 'weakness, dependence, or trust, justifiably reposed' on the other side." eToll, 811 A.2d at 23 (original emphasis omitted). The disparity in position must such that "the inferior party places complete trust in the superior party's advice and seeks no other counsel, so as to give rise to a potential abuse of power." Id.

Drawing all inferences in favor of BDR, as it must, the Court declines to dismiss this claim at this juncture. BDR has alleged that it was in an especially weak position, that it shared confidential information about this weakness, it placed its complete trust in Truefit, and that Truefit abused that trust. (Answer and Counterclaims at 110–12.) BDR avers that it gave Truefit its business plan and existing code, disclosed the "devastating experience" it had with the prior service provider regarding its application, and made clear that the unified platform was "an essential part of BDR's marketing and strategic plans." In response to this knowledge, BDR

---

[7] Truefit briefly argues that the gist of the action doctrine also bars this claim. (Truefit's Brief at 7–8.) For the same reasons this argument failed with respect to BDR's claim at Count I, it also fails here.

11

alleged that Truefit "continually represented to BDR that Truefit could do what the other service provider could not do," that Truefit would act as BDR's chief technology officer and take responsibility for release of the application, and that Truefit saw a long-term partnership with BDR. (E.g., id. at 86; 88; 91.) In sum, BDR alleges that it disclosed its weaknesses and placed its full trust in Truefit, and in response Truefit set a trap to abuse that trust for its own benefit.

The Court agrees with BDR that its allegations are different in kind and go "beyond mere reliance on superior skill" and instead describe a "relationship between the parties [that] was so markedly imbalanced" that BDR has sufficiently stated a claim. See eToll, 811 A.2d at 22–24. That being said, the Court is skeptical as to whether BDR ultimately will succeed on this claim. However, that is not the test the Court must apply to BDR's contentions at this stage. Bell Atl. Corp. v. Twombly, 550 U.S. 554, 583 (2007) ("The issue is not whether a plaintiff will ultimately prevail but whether the claimant is entitled to offer evidence to support the claims. Indeed it may appear on the face of the pleadings that a recovery is very remote and unlikely but that is not the test."). In order to survive summary judgment, the Court cautions BDR that it must produce evidence that clearly demonstrates that BDR "surrendered control" to Truefit, that Truefit was in a position to exercise undue influence on BDR, and that BDR's weakness was known and abused by Truefit.

### c. Breach of Implied Covenant of Good Faith and Fair Dealing

BDR claims that Truefit's agreements with BDR each contain an implied covenant of good faith and fair dealing. (Answer and Counterclaims at ¶¶ 113–17.) BDR alleges Truefit breached this covenant with false representations and material omissions that caused BDR to pay Truefit significant sums of money and to expend valuable resources to "retain Truefit's fraudulent services." (Id. at ¶ 115.) In support of its Motion, Truefit argues that Pennsylvania

does not recognize an independent cause of action for a breach of good faith and fair dealing. (Truefit's Brief at 8.)

With respect to allegations based solely on contractual obligations, Truefit is correct: claims for a breach of good faith and fair dealing are subsumed into any breach of contract claim. Burton v. Teleflex Inc., 707 F.3d 417, 432–33 (3d Cir. 2013) ("Pennsylvania law generally recognizes a duty of good faith in the performance of contracts, [but] this duty does not create independent substantive rights." (internal quotation marks and citation omitted).) But as the Court has already discussed, the core of BDR's allegations arise in tort, not contract. (BDR's Response at 3 ("This is a case about fraud by Truefit.").)

In this instance, the source of the allegations proves unhelpful to BDR. See Northview Motors, Inc. v. Chrysler Motors Corp., 227 F.3d 78, 92 (3d Cir. 2000) ("[W]e believe that if a plaintiff alleging a violation of the implied covenant of good faith also were to file a claim for fraud based on the same set of facts, Pennsylvania courts likely would decline to proceed with the claim alleging bad faith.") In Tuno v. NWC Warranty Corp., the Court of Appeals for the Third Circuit, while recognizing that a stand-alone claim for breach of good faith and fair dealing could be maintained under Pennsylvania law, found no error a district court's decision to dismiss such a claim based on allegations which "are redundant with the allegations underlying [plaintiff's] misrepresentation claim." 552 F. App'x 140, 144–45 (3d Cir. 2014). In coming to its conclusion, the Third Circuit noted that Pennsylvania courts had not expressed any disagreement with Northview Motors, and it similarly saw no reason to depart from that case's logic. Id. at 145.

BDR's allegations with respect to this claim are based on Truefit's alleged "false representations and material omissions to mislead BDR . . . to retain Truefit's fraudulent

13

services."  (Answer and Counterclaims at ¶ 115.)  That is, the claim is "redundant with" the allegations that form the basis of BDR's fraud claim, and thus, Count III cannot be allowed to proceed as a separate cause of action in this case.

The Court's dismissal of BDR's claim for breach of the implied covenant of good faith will be with prejudice, as such a claim is not maintainable as a matter of law.  <u>Heine v. Bureau Chief Division of Fire and Safety</u>, 765 F. App'x 816, 821–22 (3d Cir. 2019) (Affirming dismissal with prejudice where there was "no reason to believe that appellants' claims could be salvaged by amendment.")

## II. ORDER

Truefit's Motion to Dismiss (Doc. 16) is GRANTED IN PART and DENIED IN PART.  Truefit shall answer Counts I and II of BDR's Counterclaim within 14 days of this Order.

IT IS SO ORDERED.

December 26, 2019                                 s\Cathy Bissoon
                                                  Cathy Bissoon
                                                  United States District Judge

cc (via ECF email notification):

All Counsel of Record